# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

*David E. Patton*
*Executive Director*
*and Attorney-in-Chief*

*Southern District of New York*
*Jennifer L. Brown*
*Attorney-in-Charge*

**BY ECF/Hand Delivery**
The Honorable Kimba M. Wood
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   **United States v. Gerald Seppala**
       **S2 16 Cr. 436 (KMW)**

Dear Judge Wood:

Gerald "Jerry" Seppala will turn 50 years old this September. He is a loving father, husband, and community member. He suffered no blemishes on his lifelong record of political fundraising and entrepreneurship until his encounter with two of his co-defendants, Steven Brown and J. David Williams. On July 17, 2018 he will be sentenced following his plea to the misdemeanor offense of conspiring to commit bank larceny, in violation of 18 U.S.C. § 2113(b). The instant conviction represents his only criminal record. Throughout his two years on pretrial supervision, he has been fully compliant with his bail conditions, and has maintained productive employment. For the reasons that follow, including his compelling personal circumstances, his low-level role in the offense, his perfect compliance with pretrial and his great capacity for rehabilitation, we respectfully request that the Court sentence Jerry Seppala to time served and one year of supervised release.

## I.     Personal and Family Background

Jerry Seppala was born on September 18, 1968 to Richard Clarence Seppala and Beverly Jean Carlson. Jerry was his mother and father's oldest child, and the family grew up in Moundsview, Minnesota, a small suburb of the Twin Cities. Richard taught high school calculus and physics while Beverly stayed at home to raise Jerry and, later, his younger sister Kristina.

Tragedy struck the family when Jerry was four years old. Richard, who suffered from epilepsy, died from a grand mal seizure while Jerry was in the room. See Presentence Report (hereinafter "PSR") ¶ 41. His death took place just 11 months

after the birth of Jerry's sister, Kristina. It took an unimaginable toll on the entire family, but Jerry took the loss particularly hard. Id. He had already developed early memories of spending time with his father, and at such a young age, he could not fully comprehend what had happened. ████████████████████████████████ ████████████████████████████████████████████ and regrets to this day that he did not have a consistent father figure in his life.

As the family struggled emotionally with Richard's loss, they also suffered financially. Beverly was just 27 years old, and though trained as a beautician, she needed to stay home to care for her young children. She cobbled together part-time jobs as Jerry and Kristina grew older, but the family subsisted primarily on Richard's savings, insurance settlement payments from his death, and Beverly's SSI benefits. See id. ¶ 42. Though far from wealthy, the family thrived on close relationships with one another. Jerry was particularly close to his sister, Kristina, whose letter is attached as **Exhibit B**.

A central component of that family bond was the Lutheran Church. See PSR ¶ 46. Beverly raised Jerry to be involved deeply in his faith, and he cites some of his earliest positive memories as serving on his church's youth council and performing bible readings in front of the congregation. Though his religiosity started as a weekly family ritual, the church evolved for Jerry into a place for reflection that helped him cope with the death of his father. In Jerry's words, he "saw two options: embrace God and my faith or be angry at the world forever." He chose the former, and his faith and family have remained central to his life.

Beyond religion, Beverly also instilled in Jerry the value of hard work, and she hoped to give him opportunities through education that she had been unable to take advantage of. Jerry learned these values well. He excelled in school, taking advanced courses and consistently performing near the top of his class. He played hockey and skied, and made the state finals for junior squash while in high school. He developed a strong and lasting interest in politics after meeting Rudy Boschwitz, then a United States Senator representing Minnesota. Jerry volunteered for Senator Boschwitz by selling flavored milk out of his booth at the Minnesota State Fair as a teenager, but both men took far more from the experience. Jerry was inspired by Rudy's experience as a Holocaust survivor, and Rudy was struck by Jerry's remarkable work ethic:

*In 1985, at age 14 or 15, Jerry appeared as a volunteer and, unusually for volunteers who came and worked for 2 to 3 hours, Jerry was there all day every day and he was among the youngest of the volunteers...I have 4 sons, all older than Gerry, and he really became a fifth son.*

**Exhibit C,** Letter from Senator Rudy Boschwitz.

In turn, over the years that followed, Jerry began to see Senator Boschwitz as a father figure in the absence of his own father.

After high school, Jerry attended Hampden-Sydney College, a small liberal arts school in Virginia. See PSR ¶ 60. As a sophomore, he transferred to the University of Minnesota when his family could no longer afford the higher tuition. Jerry became a member of the Delta Tau Delta fraternity and remains close friends with many of his fraternity brothers. Id. Throughout college, he immersed himself in campus politics. He was an active member of the College Republicans, served on the Student Senate, and was elected class president for his senior year. Jerry graduated from Minnesota with degrees in International Relations and French in 1992. Id.

Galvanized by his political interests, Jerry moved to Washington, DC after graduation to work for Steve Gordon and Associates, a political fundraising firm that supported Republican candidates around the country – including Senator Boschwitz. See PSR ¶ 47. This position was the start of a more than 25-year career as a fundraising consultant that made Jerry one of the most respected names in his field. Over the years, he worked on presidential campaigns for George H.W. Bush, Bob Dole, and George W. Bush, as well as for Senator John McCain and Congressman Eric Cantor. Jerry's passion for his work was rooted in patriotism and strong political and religious beliefs.

But Jerry's work extended far past nationally consequential campaigns; he has used his fundraising expertise to assist countless non-profit organizations, frequently on a pro bono basis. To Jerry, this work is just as important. He has contributed his time to, among other charitable organizations, the Ascension School – a Catholic school that serves low-income students in the Twin Cities, the Memorial Blood Center, the First Tee Foundation, and the Central Lutheran Church of Minneapolis. Id. ¶ 48; see also **Exhibit D,** Letter from Steven H. Moore. Over the years his fundraising clients included Northwest Youth and Family Services, and Bolder Options, two organizations which provide social services, including intervention programs for juveniles who have entered the criminal justice system.

Despite an absorbing professional life that often required travel around the country, Jerry is a family man through and through. As Richard Carlson describes, Jerry "moves fast but listens well." **See Exhibit E,** Letter from Richard Carlson. That was his first impression of Jerry when he met his future son-in-law in 1997. Jerry and Richard's daughter, Debra Seppala, met in 1997 and married the next year.

They have now been happily married for 20 years. PSR ¶ 45. They have one child, a son, G███ S██████, who turned 17 years old in April and greatly admires his father:

*He has taught me everything I know, from golf to how to treat people to how to make smart decisions, and I believe that I would not be the person I am today if not for him.* **See Exhibit F,** Letter from G███ S██████.

As Jerry's longtime friend, former AUSA Jon Hopeman, notes, "We have not had a conversation that did not at least in part focus upon his son, of whom he is very proud. He has been very involved with the child's upbringing." **See Exhibit G,** Letter from Jon Hopeman.

Jerry also cares very deeply for his friends. In instance after instance, Jerry has offered advice and support for friends facing difficult situations. When ████████ ████████████████, Jerry arranged for an intervention without which Mr. O'Meara says "I would probably be dead." **See Exhibit H,** Letter from Michael O'Meara. ████████████████████████████. When Joseph Musolf lost his job and struggled to support his family, Jerry gave him work until he could get back on his feet. **See Exhibit I,** Letter from Joseph Musolf. When Mr. Carlson needed to sell a cabin he owned in upstate Minnesota due to his wife's illness, Jerry cleaned the cabin and researched charities to help Mr. Carlson donate the supplies inside. **See Exh. E**. And for college friend Christopher Bellini, Jerry "is the only person" with whom he discusses professional and familial stresses. **See Exhibit J,** Letter from Christopher Bellini.

While providing encouragement to his friends, Jerry encountered personal difficulties of his own – most severely, from 2008 to 2012, immediately prior to the alleged offense conduct. One of Jerry's clients failed to pay him $100,000 for a job related to the 2008 Republican National Convention, and the Carly Fiorina campaign did not pay a $60,000 obligation to Jerry from 2010 until she ran for president in 2016. These debts – which even prevented Jerry's family from celebrating Christmas in 2010 – were part of Jerry's motivation to transition away from politics and to find a new venture.

## II.   Offense Conduct

After a distinguished career in political fundraising and consulting, Jerry's life was at a turning point in late 2010. Faced with economic burdens and a dearth of candidates to work for, Jerry connected with a political acquaintance, Steven Brown, with the hopes that they could work together to create movies filmed in Minnesota. Jerry had spent several years fundraising for the Minnesota Film and Television Board, and he believed that this experience would help attract movie projects to his

home state given his knowledge of the tax incentives involved. As he began to learn more about this new business, Jerry met J. David Williams through Steven, and David presented himself as a very successful movie producer and advertiser. David and Steven offered Jerry the opportunity to help fundraise for their ongoing film projects in exchange for commission as well as financial and technical support for the films that Jerry was hoping to make himself. Jerry trusted Steven and David, and dreamed that they were in the early stages of a successful and exciting business partnership.

Jerry made one of business's most fatal errors—he got involved with the wrong people and engaged in illegal conduct that was not true to his moral character. As a result of his arrest and conviction in this case, his name and reputation have been ruined, and he is in far more dire financial straits than ever before. Steven and David took advantage of his naiveté about the film industry in order to fill their pockets. Jerry knows that he exercised extremely poor judgment in his business dealings. He is regretful, remorseful, and contrite. He looks forward to making amends by using the funds he is now earning to repay his portion of the restitution.

As the Court is aware, this case involves a complicated fraud with many deals and victims, several of which Jerry was not aware of until well after his arrest. Still, Jerry did something wrong, and for that he is taking full responsibility. When Jerry met David in 2012, Jerry agreed to help David and Steven raise money to fund print and advertising campaigns for films they were purportedly working on. In exchange, Steven and David taught Jerry about the film industry, lent their expertise and purported production experience to the projects Jerry was hoping to produce in Minnesota, and paid Jerry a commission for money he brought in for their productions. Jerry viewed working with Steven and David as an excellent opportunity, given his financial trouble and his desire to launch a new business in an unfamiliar industry. He dove into this new opportunity with his usual vigor—leaning on his connections in the political world to help launch his Minnesota film projects.

From the beginning, David and Steven worked to obscure from Jerry their true intentions and backgrounds. David presented himself to Jerry as far more wealthy and successful than he was in reality. He told Jerry (and later investors) that he had a private plane and talked often of the hundreds of millions of dollars he had successfully invested in movie projects. These were lies to induce Jerry to trust and look up to him. Jerry wanted very much to make movies in Minnesota, and he knew that he needed David and Steven to do it. Jerry worked to fundraise for print and advertising campaigns that David and Steven asked him to support, but their relationship ramped up considerably when Jerry began working on a promising documentary called *Made in America*. See PSR ¶ 9.

*Made in America* was meant to be a film about an American family who allowed fracking on its farm and the impact of that business on their family and the farm. The film planned to portray fracking in a positive light and showcase the workers and their families who rely on the natural gas industry to make a living. Jerry believed this film would be successful in the conservation community and have "crossover" potential for those viewers interested in a moving family story. Jerry was in contact with several former Republican lawmakers who were interested in helping on the project and was working to fundraise to raise capital to begin filming.

Jerry believed that Steven and David would help produce the film. They created a budget, helped look for a script writer, and helped fund a "sizzle real" of footage. Jerry was thrilled with these developments, and was excited to co-produce a film he believed in. Through Jerry's work on *Made in America*, he met ██████████, a victim in this case. Mr. ██████ is an A & E reality television star, who decided to co-produce the documentary. He invested $500,000 in the film after David Williams told Jerry that he also would pledge an additional $500,000. Id. This investment, and Jerry's representations to ██, form the heart of Jerry's misconduct.

As the producer of the film, Jerry controlled an account for Visions LLC, a limited liability company that was going to produce *Made in America*. After Mr. ██████ agreed to finance $500,000 of the film, he transferred that amount into Jerry's account. At the same time Mr. ██████ invested, David was to transfer $500,000 of his money into the Visions LLC account, creating a starting budget of $1,000,000. However, the money did not come, and David told Jerry that instead the money would be in a separate "production" account controlled by David. He then sent Jerry a Chase Bank account statement showing over $500,000 in another Visions LLC account—one that Jerry did not control. Jerry forwarded this statement to Mr. ██████ as proof that David has transferred the money, and he also transferred the $500,000 Mr. ██████ invested into David's account, on David's orders. See PSR ¶ 10. Jerry believed David was going to use the money to make the film, but he was not honest with Mr. ██████ about who was controlling the money. This was Jerry's fraud. He wanted the deal to get done and he trusted David, but in the process Jerry lied to an investor about who was controlling his funds.

David subsequently transferred Jerry $50,000, which was his fee to produce the film, and then, as we have learned in discovery, spent Mr. ██████'s money on his own extravagant lifestyle. Indeed, over the next several months, without Jerry's involvement or assistance, Steven and Jerry induced Mr. ██████ to invest millions of dollars into other film projects. Jerry was not involved in any of this but he is remorseful for not having informed Mr. ██████ that he did not have management authority over his original investment, and he recognizes the likelihood that Mr. ██████ would not have proceeded with other investments if he had known the truth.

Nevertheless, every dollar Jerry received from Steven and David was payment for money owed to him. Either it was reimbursement for legal fees, commission, or a small retainer to keep Jerry fundraising for them. He did not benefit from the millions of dollars Steven and David later received from Mr. ███. He continued to work for Steven and David after this investment, and he believed *Made in America* was in the works. He also believed Steven and David were making good on other promises to investors for films like *The Letters*, which was a movie Jerry deeply believed in. However, as time went on, Jerry should have recognized that Steven and David were not being honest with him, and he should have stopped working with them.

There can be no question that Steven and David profited immensely from their offense conduct with the victims. The opposite is true for Jerry. He made very little from his minimal role in this offense. As time went on, Jerry tried to salvage the projects he believed in, even by continuing to work with David. But because of this poor judgment, he has lost everything. Since his arrest, he started from scratch by working low-paying jobs to make ends meet with his family. They lost their home, and they are just now starting to climb their way out of debt.

## III.    Consequences and Aftermath

Jerry's arrest was devasting for him. The reputation he worked so hard to build was irreparably tarnished and his financial liabilities were mounting. For months, he applied for consulting jobs, but did he receive calls back for more than a first interview. Jerry has tried to work steady since the arrest—taking whatever jobs have come his way. He has worked at Target, selling cars at an Audi dealership, as a food delivery courier for Mission Foods, a furniture Salesman for 2nd Shade Patio Furniture, and as a part-time wine salesman at a local wine shop. See PSR ¶¶ 63–66. These jobs were not enough to keep the bank from foreclosing on his family home. See id. ¶ 53. Still, Jerry fought hard to stay positive, and now he is working as a production assistant on *The Harbinger*, at a studio he helped found -- Ironbound Studios. See id. ¶ 62. Even with this new work, the Seppala family's household income is less than one-fifth what it had been before Jerry's arrest. Jerry and Debra have relied extensively on family members for help. Recognizing the family's financial distress, Jerry's son, G███, transferred to a public high school after attending the same private school for many years.

Jerry's close friends have remained supportive – even public figures such as Rudy Boschwitz, a former United States Senator, and Jon Hopeman, a former Assistant U.S. Attorney in Minnesota stand by him. But in a field centered on connections and reputation, Jerry has lost touch with nearly all his professional contacts. Yet as those close to Jerry confirm, he has handled these life-altering

challenges with grace. Jerry believes the case has actually helped him in some ways. For example, though he has always been close to his friends and family, his charges have made him realize that they are far more important than professional success. Jerry views his case as a message from God that his priorities had become distorted, and regrets that it took a criminal indictment to make this clear.

Jerry's half-sister, Ashley, notes that he is "so much more in the moment" and "grateful for family time." <u>See</u> **Exhibit K,** Letter from Ashley Wallace. His pastors at St. Phillip the Deacon describe his "willingness to be vulnerable in expressing his hardships" and the way he views his predicament as "trying to understand more fully God's will for him." <u>See</u> **Exhibits L & M,** Letters from Pastors Mark D. Schmid and Tim Westermeyer. His son writes:

*I believe that this whole experience has made my dad a better man and has strengthened our bond as a family, in a way that many people who are facing the same experience cannot claim to share.*
**Exh. G.**

Jerry's constructive response to his circumstances is rooted in his religious beliefs and involvement in the Lutheran Church. <u>See</u> Ex. A (Letter from Jerry Seppala). Just as he sought refuge in God to cope with his father's tragic death, Jerry has done the same over the past year. His contributions to the church are invaluable: he lectors and serves communion at services every week, volunteers with five church fundraising activities including Habitat for Humanity and distributing meals at a soup kitchen during Lent, and most rewardingly for Jerry, he teaches a weekly confirmation class to middle schoolers. Jerry's leads the course with Tom Melander, who he met when they were assigned to co-teach the class. Mr. Melander describes Jerry's character and his impact on their students:

*My initial size-up of Jerry was that he's a typical Wayzata man, too self-impressed to give a damn about anyone but himself. I let his personal style and his LinkedIn profile tell me all I thought I needed to know. Yet, as I watched him interacting with our group, other confirmation leaders, our pastors, as well as with his own wife and son, I came to realize that I had misjudged him, both as a man, and as a potential friend.*

Mr. Melander's letter continues:

*Honorable Judge Wood, since originally writing this letter of support for Jerry in May of 2017, my friendship with, and admiration for Jerry has only grown. Jerry's prosecution and plea has taken a tremendous toll on Jerry both personally and financially. But where most men would crumble, throughout his prosecution, I have*

*also seen Jerry persevere, faithfully following his vision to bring film industry employment opportunities to the Iron Range of Minnesota.*
<u>See</u> **Exhibit N**, Letter of Tom Melander

## IV.    Guidelines Range and Appropriate Sentence

Jerry Seppala stands convicted of a misdemeanor offense. At age 49, he has no prior criminal record. He is the first defendant to be sentenced in the above-captioned matter, and he is the only defendant to plead to a misdemeanor as opposed to a felony. This is because his role in the offense is by far the least culpable of all charged.

As detailed in the PSR, the applicable guidelines range is twelve months in prison. There is no mandatory minimum prison term associated with his offense, and the Court is fully authorized to impose a sentence not involving incarceration. <u>See</u> PSR at 23. We respectfully request the Court do just that by imposing a sentence of time served to be followed by one year of supervised release. A sentence of time served would be consistent with other individuals who pleaded guilty to the same misdemeanor in this District. <u>See</u>, <u>e.g.</u>, <u>United States v. Donkor</u>, 15 Cr 672 (JPO) (2 years' probation); <u>United States v. Mingo Lamar</u>, 18 Cr. 107 (SDA) (two years supervised release). Through his full compliance with the conditions of pretrial supervision, and his lack of prior criminal record, Jerry has demonstrated that he poses absolutely no risk of recidivism. A sentence of one year of supervised release is the most appropriate sentence considering all of the 18 U.S.C. § 3553(a) factors.

## V.    Conclusion

The aberrant nature of the conduct, Jerry's strong character, solid ties to his community, and his minimal role in the offense all militate in favor of imposing a sentence of one year of supervised release. Jerry understands more than ever the painful consequences of ever again putting himself in a situation like the one that led to these charges. He looks forward to closing this chapter in his life and will continue to make the most of this situation by repaying the victims and helping improve the lives of those around him.

Respectfully submitted,

_____/s/_____
Ian Marcus Amelkin
Annalisa Mirón
Federal Defenders of New York, Inc.
Attorneys for Gerald Seppala
(212) 417-8733/ 8780