

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 10, 2018

**Via ECF and By Hand**

The Honorable Kimba M. Wood
United States District Judge
Southern District of New York
500 Pearl Street, Room 1910
New York, NY 10007

   Re: **United States v. Gerald Seppala**
      **16 Cr. 436 (KMW)**

Dear Judge Wood:

  The Government submits this letter in advance of the sentencing of Gerald Seppala (the "defendant" or "Seppala"), which is scheduled for July 17, 2018 at 11:00 a.m. For the reasons set forth below, the Government respectfully submits that a sentence at the statutory maximum of one year is sufficient, but not greater than necessary, to achieve the goals of sentencing.

## Background

### A. Offense Conduct

  Over a period of approximately four years, the defendant, along with his co-defendants James David Williams ("Williams") and Steven Brown ("Brown"), participated in an elaborate scheme to defraud multiple investors in film projects. Seppala's victims lost over $1 million based on false guaranteed returns and misrepresentations that funding had already been committed to the film projects, among other misrepresentations. (Presentence Investigation Report ("PSR") ¶¶ 8, 16).

  In or about April 2013, Seppala introduced Williams and Brown to an individual ("Victim-1") interested in the possibility of investing in a feature-length documentary ("Movie-1"). (*Id.* ¶ 9). Seppala, Williams and Brown explained to Victim-1 that Brown and Seppala were acting as the producers for Movie-1 and that a company managed by Seppala called Visions, LLC ("Visions") would serve as the primary production and financing vehicle for Movie-1. To induce Victim-1 to invest, Victim-1 was further informed that he would be among a class of shareholders with a right to recoup their investment first and would receive a pro-rata share of Movie-1's profits. Williams,

Brown and Seppala further falsely represented to Victim-1 that Williams planned to invest $500,000 in Movie-1. Victim-1 requested documentation showing that Williams had, in fact, invested $500,000 into Movie-1 before Victim-1 would make his own $500,000 investment. To convince Victim-1 to invest in Movie-1, Seppala provided Victim-1 various documents demonstrating Williams had already committed $500,000 to the film. On or about April 15, 2013, Seppala sent an email to Victim-1 attaching an email from Williams containing what purported to be a confirmation of a wire transfer of $500,000 from a bank account controlled by Williams into a Visions bank account (the "Visions Account"). Seppala then forwarded a copy of that April 15, 2013 email to Williams and Brown. Seppala was the only signer on the Visions Account and controlled the Visions Account, and thus could have easily verified whether Williams had, in fact, wired $500,000 into the Visions Account. In reality, Williams had not transferred any funds into the Visions Account controlled by Seppala and the wire transfer record he sent Seppala and which Seppala then forwarded on to Victim-1 was fake. Unless one is to believe the implausible proposition that Seppala never again checked the balance of the Visions Account, Seppala would have necessarily either known at the time or learned soon after that Williams had not wired $500,000 into the Visions Account and that, accordingly, the wire transfer confirmation Seppala had sent to Victim-1 was fake.[1] Yet Seppala never informed Victim-1 of this fact and Victim-1 ultimately invested $500,000 in Movie-1 and wired $500,000 to the Visions Account on or about April 26, 2013 based, in part, on the misrepresentation that Williams had already deposited his $500,000 into the Visions Account.

Several days later, as further confirmation of Williams' supposed investment, Seppala sent Victim-1's attorney via email what purported to be a screenshot of an online statement for the Visions Account, which showed a balance of approximately $531,610.12 as well as an acknowledgement, signed by Seppala, that Visions had already received Williams' $500,000. Because Seppala controlled the entity Visions and was the sole signer on the Visions Account, there is no plausible argument that Seppala believed the screenshots that he was sending to Victim-1 were true and accurate. In addition, the next day, Seppala, copying Williams, sent Victim-1 a copy of an agreement, signed by Williams, confirming Williams' purchase of an identical stake in Movie-1. (PSR ¶ 10)

A substantial portion of Victim-1's $500,000 investment was diverted for the personal use of Williams, Brown, and Seppala. (PSR ¶ 13). Seppala used a portion of these funds to make payments towards a golf club, pay private school, and for car and mortgage payments, among other personal expenses. (PSR ¶ 13).

In the Spring of 2014, Seppala approached two additional individuals ("Victim-2" and "Victim-3") about the possibility of investing in another movie in which Williams and Brown were

---

[1] Indeed, on April 26, 2013 – the same day that Victim-1 wired his $500,000 into the Visions Account – Seppala personally signed a withdrawal ticket for the Visions Account withdrawing $450,000 from the Visions Account.

involved. ("Movie-2"). (PSR ¶ 14). Based on false representations regarding, among other things, the return on investment Victim-2 and Victim-3 could expect, and the status of the funding for Movie-2, Victim-2 and Victim-3 each invested $100,000 in Movie-2. Neither Victim-2 nor Victim-3 ever received any money in connection with their investment in Movie-2 and eventually requested the return of their funds. Despite repeated requests, Victim-2 and Victim-3 never received any of their money back. The money invested by Victim-2 and Victim-3 was, in fact, used for purposes unrelated to Movie-2, including for the personal use of Williams and Brown and, in part, for the personal use of Seppala. (PSR ¶ 14).

Seppala's involvement in the scheme also included defrauding four additional investors in film-related projects. (PSR ¶ 15).

### B. The Applicable Guidelines Range and Probation Office Recommendation

On or about December 5, 2017, the defendant pleaded guilty pursuant to a plea agreement to a one-count Information charging him with conspiring to commit misdemeanor bank larceny, in violation of Title 18, United States Code, Sections 371 and 2113(b). The applicable offense level, as calculated by both the plea agreement and the Probation Office, is 17. (PSR ¶ 32). As reflected in the PSR and the plea agreement, the defendant has 0 criminal history points and his Criminal History Category is I. (PSR ¶ 80). Accordingly, based on the total offense level of 17 and the Criminal History Category of I, the defendant's Guidelines range is 24 to 30 months' imprisonment. However, the maximum sentence pursuant to the statute under which the defendant pleaded guilty is 12 months' imprisonment. (PSR ¶ 80).

In the PSR, the Probation Office recommends a sentence of four months' imprisonment. The Probation Office further recommends forfeiture in the amount of $999.99 and restitution in the amount of $1,032,500.[2] (PSR, page 23).

### Discussion

The general purposes of sentencing include the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further

---

[2] The Government is submitting as an exhibit to this sentencing memorandum a proposed restitution in the total amount of $1,037,500.00, rather than $1,032,500. The $5,000 difference in the restitution amount is a result of the Government's efforts to collect updated information from victims and to ensure that its calculations as to the appropriate amounts included in restitution are accurate. The Government respectfully requests that this restitution order be entered by the Court at the time that the judgment in this case is entered. A redacted copy of the restitution order that omits victims' addresses has been filed publicly on the docket, and an unredacted copy is being provided to the Court by hand.

crimes of the defendant. *See United States* v. *Park*, 758 F.3d 193, 197 (2d Cir. 2014) (citing 18 U.S.C. § 3553(a)(2)). In addition, the particular sentence imposed must consider the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1).

The Government respectfully submits that the application of the statutory sentencing factors set forth in Title 18, United States Code, Section 3553(a) supports the imposition of a sentence within the applicable Guidelines range, or, in this case, at the statutorily authorized maximum of 12 months' imprisonment. A sentence of 12 months' imprisonment would be sufficient, but not greater than necessary, to reflect the nature, circumstances, and seriousness of the offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence, while also taking into account the history and characteristics of the defendant.

The defendant's offense is a serious one. The defendant, over a period of years, participated in a scheme to defraud seven investors in film projects. The defendant's fraud was not a one-time error in judgment, but rather represents a conscious choice to participate in a long-running fraud scheme with Williams and Brown.

While the defendant was certainly not the leader of the scheme, as is reflected by the fact he was permitted to plead guilty to a misdemeanor offense, the defendant's role in the conspiracy was not an insubstantial one. In order to induce Victim-1 to invest $500,000, the defendant forwarded false documents to Victim-1 reflecting a wire transfer of $500,000 by Williams into the Visions Account, which was a bank account that the defendant controlled and for which he was the sole signer. With respect to other victims of the scheme, the defendant vouched for Williams and Brown, luring victims into the scheme when the defendant knew that Williams and Brown had previously made misrepresentations to investors and diverted their funds. And while Williams and Brown enjoyed the majority of the proceeds of the fraud, Seppala also participated and used victim funds to pay for his own personal expenses, including payments towards a golf club, to pay for private school, and for car and mortgage payments, among other personal expenses. The losses arising from Seppala's conduct were substantial and exceeded $1 million.

In light of the scope of Seppala's offense conduct and the significant harm to victims which resulted from the scheme, the Government respectfully submits that the four-month term of imprisonment recommended by the Probation Office is inadequate to reflect the seriousness of the offense and to promote adequate general and specific deterrence. In the Government's view, the sentence recommended by the Probation Office would afford the defendant inappropriate leniency given the seriousness of the defendant's offense. The defendant has already received significant leniency by being permitted to plead to a misdemeanor offense rather than a felony. But for the fact that Seppala was permitted to plead guilty to a misdemeanor with a statutory maximum sentence of one year, the Guidelines range in this case would be 24 to 30 months' imprisonment. To afford the defendant any further leniency would not adequately serve the purposes of sentencing set forth in Section 3553(a).

The Honorable Kimba M. Wood
July 10, 2018
Page 5 of 5

      In sum, for foregoing reasons, the Government respectfully submits that a sentence at the statutory maximum of one year appropriately balances the defendant's serious offense conduct and the need for general and specific deterrence against the defendant's history and characteristics.

      Respectfully submitted,

      GEOFFREY S. BERMAN
      United States Attorney

By:

      Noah Solowiejczyk
      Katherine Reilly
      Assistant United States Attorney
      Southern District of New York
      (212) 637-2473/6521

cc:    Annalisa Miron, Esq. (via ECF)
       Ian Marcus Amelkin, Esq. (via ECF)